## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PATRICIA MCINTYRE,** | : | **CIVIL ACTION** |
| **on behalf of herself and all others** | : | |
| **similarly situated,** | : | |
| *Plaintiff,* | : | |
| **v.** | : | **No. 18-3934** |
| | : | |
| **REALPAGE, INC., d/b/a ON-SITE,** | : | |
| *Defendant.* | : | |

## <u>MEMORANDUM</u>

## I.    INTRODUCTION

This case arises from the inaccurate reporting of eviction records about tenant applicants to landlords and property managers.  Tenant applicant, Patricia McIntyre ("Plaintiff"), on behalf of herself and similarly situated individuals, filed this consumer class action against RealPage, Inc. ("Defendant") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (the "FCRA").

Plaintiff alleges that Defendant has failed to "assure" the "maximum possible accuracy" of its reporting of eviction records before selling the data and its reports to prospective landlords, who rely on those reports to assess and screen tenant applicants.  Plaintiff alleges that due to Defendant's deficient practices in its collection and updating of the records it reports to landlords, Defendant has inaccurately reported thousands of negative dispositions that had been resolved in the tenants' favor.  Plaintiff seeks uniform statutory damages under FCRA section

1681n for herself and other class members.

Before the Court is Plaintiff's Motion for Class Certification (ECF No. 41). Defendant filed its Response in Opposition (ECF No. 51), and Plaintiff filed its Reply (ECF No. 56).  The Court heard oral argument on June 4, 2020. ECF No. 58. The Motion is fully briefed for consideration.

## II.    BACKGROUND

Plaintiff is an adult individual who resides in Philadelphia, Pennsylvania. ECF No. 1 at 2.  Defendant is a nationwide consumer reporting agency ("CRA") and is regulated by the FCRA. ECF No. 41-1 at 10.  Defendant is headquartered in Richardson, Texas, and regularly conducts business in the Commonwealth of Pennsylvania. ECF No. 1 at 2.

Defendant operates its tenant screening business through two wholly owned subsidiaries, "On-Site" and "LeasingDesk." ECF No. 41-1 at 10.  Defendant acquired "On-Site," and certain assets of On-Site Manager, Inc., in September 2017. *Id*.  The "LeasingDesk" division has been in place for many years, and most of Defendant's employees have duties and responsibilities that span both divisions or "platforms." *Id*.  According to Defendant's corporate representatives, Defendant utilizes a unified screening business that operates and produces both "On-Site" and "LeasingDesk" branded tenant screening reports. *Id*. at 11.

The screening reports Defendant creates are used by landlords and property

2

managers to determine whether they should approve or decline a prospective tenant's lease application. *Id*.  According to Plaintiff, Defendant purchases its eviction information "from private third-party vendors instead of retrieving the actual underlying court records themselves—or even more manageable digital representations—for the purpose of creating and selling consumer reports to third party landlords and rental property managers." *Id*.  The information Defendant purchases is "merely a summary prepared by its vendors that does not include all the information or the most up-to-date information available at the courthouses or government offices where the records themselves are housed in conjunction with the day-to-day functioning of those entities." *Id*. at 12.

Plaintiff alleges that both screening divisions, "On-Site" and "LeasingDesk," use the *same* data from the *same* vendor, LexisNexis. *Id*. (emphasis in original). Defendant's chief financial officer executed the contract with LexisNexis. *Id*.  To date, Defendant has not produced any other contracts concerning its acquisition of public record information in this matter and Defendant's chief financial officer testified that he is not aware of another one. *Id*.

According to Plaintiff, regulators investigated the three leading credit reporting agencies, TransUnion, LLC, Equifax Information Services, LLC, and Experian Information Solutions, Inc. (the "Big Three"), for purchasing "distilled, incomplete public records summaries from LexisNexis." ECF No. 1 at 3.  As a

result, following a finding that this practice failed to meet certain minimum standards, the Big Three ended their regular collection, or "feed," from LexisNexis. ECF No. 41-1 at 13.  Plaintiff posits that "[a]lthough the Big Three stepped back from LexisNexis and using public records information in their consumer reporting products, other CRAs, like Defendant, continue to do so." *Id*. at 14.

Defendant's contract with LexisNexis states that LexisNexis is supposed to deliver court updates to public records when an eviction proceeding had been withdrawn, dismissed, vacated, or satisfied. *Id*. at 15.  Plaintiff points out that the "contract also provides that such information is to be provided only when 'commercially reasonable.'" *Id*.  Plaintiff alleges that "based upon [this] common policy and practice, Defendant regularly reports inaccurate and out-of-date eviction information pertaining to cases and judgments that have been dismissed, withdrawn, satisfied, or have resulted in a judgment for the tenant." ECF No. 1 at 5.  Accordingly, "[c]onsumers who have obtained the dismissal, withdrawal of an eviction matter, satisfied an eviction judgment, or prevailed in an eviction matter are prejudiced in their ability to obtain leased housing." *Id*. at 5-6.

*Allegations Specific to Proposed Lead Plaintiff*

In Plaintiff's case, she alleges that "Defendant reported three eviction cases from Philadelphia, and all three were inaccurate." ECF No. 41-1 at 7.  One eviction

4

had been voluntarily withdrawn, a second that was vacated and dismissed, and a third that was satisfied years before Defendant prepared its report on Plaintiff. *Id*. Defendant failed to report these favorable final dispositions, "even though it admits in its internal documents and in deposition testimony that it should have done so." *Id*. at 7 (emphasis in original).  Plaintiff suggests, "LexisNexis simply never bothered to spend the money to go back to the courts regularly and get those updates, and Defendant never bothered to notice before Plaintiff disputed those records through her attorneys filing this lawsuit." *Id*. at 15.

On or about October 26, 2017, Plaintiff applied to rent an apartment in Philadelphia. ECF No. 1 at 6.  Defendant prepared a screening report about Plaintiff, under its trade name "On-Site," and charged a fee for doing so. *Id*.  The report included a section labeled "Landlord Tenant Court Records." *Id*.

The first inaccurate and out-of-date item appeared, in relevant part, as follows:

| Date Filed 12/2016 | Case Type CIVIL ACTION FOR POSSESSION | Court PHILADELPHIA | Case Number 1612063568 | Notice Type |
|---|---|---|---|---|
| | Judgment | Judgment Amount | Status | Amount Paid |
| | Defendants PATRICIA MCINTYRE | | | |
| | Address 3701 CONSHOHOCKEN AV. 31 921 PHILADELPHIA, PA 19131 | | Comments | |
| | Plaintiff DUFFIELD HOUSE ASSOC | | Plaintiff Phone # | |

*Id*. at 7.  According to Plaintiff, "[t]his information was inaccurate and out-of-date

because the complaint filed against Plaintiff in case LT-16-12-06-3568 on December 6, 2016 was reduced to judgment on February 15, 2017, but that judgment was *vacated* on May 18, 2017 and the case itself was withdrawn/dismissed on July 28, 2017." *Id.* (emphasis in original).  Documents reflecting these updates were filed on the publicly available case docket contemporaneously with their entry. *Id.*  As of the date of the report, Defendant had failed to update the status of the December 6, 2016 filing for nearly six months. *Id.*  The report contained no reference to the vacatur of the judgment or the withdrawal of the case. *Id.*

The second inaccurate and out-of-date entry appeared, in relevant part, as follows:

| Date Filed 11/2012 | Case Type CIVIL ACTION FOR POSSESSION | Court PHILADELPHIA | Case Number 1210053884 | Notice Type |
|---|---|---|---|---|
| | Judgment FOR PLAINTIFF 11/6/2012 | Judgment Amount | Status | Amount Paid |
| | Defendants PATRICIA MCINTYRE | | | |
| | Address 3902 CITY AVE. B1223, PHILADELPHIA, PA 19131 | | Comments | |
| | Plaintiff BLDG PHILADELPHIA LP | | Plaintiff Phone # | |

*Id.* at 8.  According to Plaintiff, "[t]his information was inaccurate and out-of-date because Plaintiff *satisfied* the judgment entered against her on November 6, 2012 in case LT-12-10-05-3884 on May 14, 2015, when an entry reflecting that updated disposition was filed on the publicly-available case docket. *Id.* at 8 (emphasis in

original).  As of the date of the report, Defendant had failed to update the status of

the November 6, 2012 judgment for nearly two and a half years. *Id*.  The report

contained no reference to the satisfaction. *Id*.

      This second eviction case contained another inaccurate entry that appeared

in the report, in relevant part, as follows:

| Date Filed 10/2012 | Case Type CIVIL ACTION FOR POSSESSION | Court PHILADELPHIA | Case Number 1210053884 | Notice Type |
|---|---|---|---|---|
| | Judgment | Judgment Amount | Status | Amount Paid |
| | Defendants PATRICIA MCINTYRE | | | |
| | Address 3902 CITY AVE. B1223, PHILADELPHIA, PA 19131 | | Comments | |
| | Plaintiff BLDG PHILADELPHIA LP | | Plaintiff Phone # | |

*Id*.  According to Plaintiff, "[t]his information was inaccurate and out-of-date

because the complaint filed against Plaintiff in case LT-12-10-05-3884 on October

5, 2012 was reduced to judgment on November 6, 2012, which judgment Plaintiff

*satisfied* on May 14, 2015, when an entry reflecting that updated disposition was

filed on the publicly-available case docket." *Id*. at 8-9 (emphasis in original).  As

of the date of the report, Defendant had failed to update the status of the November

6, 2012 judgment for nearly two and a half years. *Id*. at 9.  The report contained no

reference to the satisfaction. *Id*.

      The third inaccurate and out-of-date entry appeared, in relevant part, as

follows:

| Date Filed<br>1/2012 | Case Type<br>CIVIL ACTION FOR<br>POSSESSION | Court<br>PHILADELPHIA | Case Number<br>1201185230 | Notice Type |
|---|---|---|---|---|
| | Judgment | Judgment Amount | Status | Amount Paid |
| | Defendants<br>PATRICIA MCINTYRE | | | |
| | Address<br>3902 CITY AVE. B1223, PHILADELPHIA, PA<br>19131 | | Comments | |
| | Plaintiff<br>BLDG PHILADELPHIA LP | | Plaintiff Phone # | |

*Id*.  According to Plaintiff, "[t]his information was inaccurate and out-of-date because the complaint filed against Plaintiff on January 18, 2012 in case LT-12-01-18-5230 was *withdrawn* on February 17, 2012, when an entry reflecting that updated disposition was filed on the publicly-available case docket." *Id*. (emphasis in original).  As of the date of the report, Defendant had failed to update the status of case LT-12-01-18-5230 for nearly six years. *Id*.  The report contained no reference to the withdrawal. *Id*.  Ultimately, Plaintiff's rental application was denied. ECF No. 41-1 at 17.

At deposition, Defendant characterized the inaccuracies as a "one-off." *Id*. Plaintiff characterizes the inaccuracies as an example of what is not "commercially reasonable" under the contract with LexisNexis because the accurate information was publicly available at the time Defendant issued its report on Plaintiff. *Id. at 15*.

Defendant also maintains a file in its LeasingDesk platform about Plaintiff. *Id*. at 17.  Plaintiff asserts that "both of Defendant's screening divisions or platforms contained the same inaccurately reported eviction cases about Plaintiff

from Defendant's common data source, LexisNexis, [], and upon request through either its On-Site platform or its LeasingDesk platform, Defendant would provide this inaccurate eviction record information about Plaintiff to one or more of its customers." *Id*. at 22.

Plaintiff alleges that "Defendant's conduct was a result of its deliberate policies and practices, was willful, and carried out in reckless disregard for consumers' rights as set forth under sections 1681e(b) and 1681g(a) of the FCRA, and further assumed an unjustifiably high risk of harm." ECF No. 1 at 9-10.

*Allegations Specific to the Class at Large*

In her complaint, Plaintiff asserted a nationwide class, and two subclasses (one for the Commonwealth of Pennsylvania and one for the city of Philadelphia), for Defendant's violations of FCRA section 1681e(b).[1] ECF No. 1 at 10.

---

[1] **Failure to Update Class – Nationwide**
For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all natural persons with an address in the United States and its Territories who were subjects of tenant screening reports created by Defendant that contained eviction information, but which failed to state that the action had been withdrawn, dismissed, non-suited, or resulted in a judgment for the tenant defendant according to court records dated at least 30 days prior to the date of the report.

**Failure to Update Subclass I: Commonwealth of Pennsylvania**
For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all natural persons with an address in the United States and its Territories who were subjects of tenant screening reports created by Defendant that contained information pertaining to a landlord tenant action filed within the Commonwealth of Pennsylvania, but which failed to state that the action had been withdrawn, dismissed, non-suited, or resulted in a judgment for the tenant defendant according to court records dated at least 30 days prior to the date of the report.

**Failure to Update Subclass II: Philadelphia**
For the period beginning five (5) years prior to the filing of this Complaint and continuing

9

During discovery, which is still ongoing, Plaintiff reviewed Pennsylvania eviction records reported by Defendant to a potential landlord or property manager, as well as internal consumer disputes and investigation records for eviction data. ECF No. 41-1 at 18.  Plaintiff claims that "[b]oth of these sources of discovery have revealed numerous class members." *Id*.

Defendant produced a spreadsheet, which Plaintiff represents contains "data concerning 904 times [Defendant] reported information about eviction cases from Pennsylvania courts (from Philadelphia) in a tenant screening report it prepared from October 30, 2016 and July 3, 2019." *Id*. at 18-19.  Plaintiff performed her own analysis of the same spreadsheet and explains that "Defendant did not obtain and did not report the correct final disposition of [a] case over 85% of the time." *Id*. at 19.  When accounting for repeat inaccuracies, the error rate reaches 88%. *Id*.

Regarding national data, Plaintiff relied on Defendant's supplemental interrogatory response, which Plaintiff claims establishes that out of "43,821 eviction disputes made by tenants between February 7, 2017 and December 10, 2019 … 2,932 disputes were closed as duplicates … 19,393 disputes had to be

---

through the date of judgment, all natural persons with an address in the United States and its Territories who were subjects of tenant screening reports created by Defendant that contained information pertaining to a landlord tenant action filed in the Philadelphia, Pennsylvania Municipal Court but which failed to state that the action had been withdrawn, dismissed, non-suited, or resulted in a judgment for the tenant defendant according to court records dated at least 30 days prior to the date of the report.

resolved fully in favor of the consumer, and 1,156 disputes had to be resolved partially in favor of the consumer." *Id*. at 19 (internal citations omitted).  Thus, in sum, Plaintiff posits that "over 50% [of Defendant's nationwide eviction records] had to be corrected in whole or in part." *Id*.

Although Plaintiff originally alleged three separate classes (*see supra* n.1), Plaintiff now moves to certify only the following nationwide class:

> For the period beginning two (2) years prior to the filing of the Class Action Complaint and continuing through the date of judgment, all natural persons with an address in the United States and its Territories who were (a) the subject of a tenant screening report prepared by Defendant that (b) contained information about an eviction proceeding, but which (c) failed to state that the eviction proceeding had been withdrawn, dismissed, vacated, satisfied or otherwise resulted in a favorable disposition or had no judicial finding against the consumer who was the subject of the tenant screening report, as that eviction proceeding is reflected in court records publicly available at the time of Defendant's tenant screening report.

*Id*. at 10.  Plaintiff also moves to be designated class representative. *Id*. at 26.

Defendant contests class certification on multiple grounds.  Mainly, Defendant argues class certification is improper for the following three reasons (1) the proposed class "implicate[s] the procedures of thousands of different courts"; (2) "Plaintiff attempts a class across separate entities with different procedures"; and (3) Plaintiff's eviction report was not generated through LeasingDesk, nor did it involve LeasingDesk data. ECF No. 51-1 at 9, 11, 12. Defendant claims that it obtains records "from hundreds of jurisdictions

encompassing thousands of individual courts across the country," and points to an array of other facts, all of which relate to the way in which it gathers the data it uses to generate its reports.  Stated differently, Defendant's argument focuses on its conduct *prior to* the point in time when it ultimately sells eviction reports to its customers (i.e., the efforts it makes to gather data used to generate reports). Defendant also claims that in order to prevail, Plaintiff must "show that for herself, and each class member, that RP On-Site's procedures were not only negligent, but that they were also in 'willful' violation of the FCRA." ECF No. 51-1 at 21.  Thus, Defendant maintains that Plaintiff must prove negligence.

As explained in greater detail below, however, because the Court finds that Plaintiff is not required to prove that Defendant was negligent, most, if not all, of Defendant's arguments opposing certification are inapplicable.

## III.   DISCUSSION

### A.   Legal Standard

#### 1.   *Class Certification*

"The class-action device is an exception to the rule that litigation is usually conducted by and on behalf of the individual named parties only." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015), *as amended* (Apr. 28, 2015) (citing *Comcast Corp. v. Behrend*, 569 U.S. 33 (2013)) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)) (internal quotations omitted).  "Accordingly, the

party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Id*. (citation omitted).

In order for a class to be certified, the named plaintiff must satisfy all four prerequisites of Rule 23(a) and at least one of the Rule 23(b) tests. *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994) (citing *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3d Cir.), *cert. denied*, 421 U.S. 1011 (1975)).  Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if
>
>> (1) the class is so numerous that joinder of all members is impracticable,
>>
>> (2) there are questions of law or fact common to the class,
>>
>> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>>
>> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These four requirements are commonly referred to as numerosity, commonality, typicality, and adequacy, respectively.

Here, Plaintiff states that she is proceeding under Rule 23(b)(3), which provides that a class action may be maintained if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

13

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  The requirements are commonly referred to as predominance and superiority. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2008).  Under Rule 23(b)(3), class certification is appropriate where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Id*.  In other words, a plaintiff "must 'demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 190-91 (3d Cir. 2020) (alteration in original) (citing *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600 (3d Cir. 2012) (quoting *Hydrogen Peroxide*, 552 F.3d at 311)).

2.    *Substantive Law*

"The FCRA creates a private right of action against credit reporting agencies for the negligent or willful violation of any duty imposed under the statute."

14

*Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995) (citing

15 U.S.C. §§ 1681o & 1681n) (citations omitted).

The duty at issue in this case is imposed by 15 U.S.C. § 1681e(b), which

provides: "Whenever a consumer reporting agency prepares a consumer report it

shall follow reasonable procedures to assure maximum possible accuracy of the

information concerning the individual about whom the report relates." § 1681e(b).

The statute provides for the following damages:

Any person who willfully fails to comply with any requirement imposed
under this subchapter with respect to any consumer is liable to that consumer
in an amount equal to the sum of—

>(1) (A) any actual damages sustained by the consumer as a result of
>the failure or damages of not less than $100 and not more than
>$1,000; or

>(B) in the case of liability of a natural person for obtaining a consumer
>report under false pretenses or knowingly without a permissible
>purpose, actual damages sustained by the consumer as a result of the
>failure or $1,000, whichever is greater;

>(2) such amount of punitive damages as the court may allow; and

>(3) in the case of any successful action to enforce any liability under
>this section, the costs of the action together with reasonable attorney's
>fees as determined by the court.

15 U.S.C. § 1681n(a).

The elements of a willfulness claim are (1) inaccuracy and (2) a failure to

follow reasonable procedures that is (3) knowing or reckless. *Feliciano v.*

*CoreLogic Rental Prop. Sols., LLC*, 332 F.R.D. 98, 105 (S.D.N.Y. 2019); *see*

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007) ("willfulness" in FCRA encompasses both knowing and reckless violations).  "Willful" under the FCRA means "reckless disregard of statutory duty." *Safeco*, 551 U.S. at 57-58.  A reckless action entails "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id*. at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).  Thus, unlike with negligence claims, actual damages and causation are not elements of a willfulness claim.

The overwhelming weight of authority holds that a credit report is inaccurate under § 1681e(b) either "when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Schweitzer v. Equifax Info. Sols. LLC*, 441 Fed. Appx. 896, 902 (3d Cir. 2011) (citations omitted).

B.     Application

The law is clear: "[c]lass certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *Hydrogen Peroxide*, 552 F.3d at 309 (citations omitted).

However, before addressing the Rule 23(a) factors and the Rule 23(b)(3) test, the Third Circuit recognizes that "an essential prerequisite of a class action, at least with respect to actions [proceeding] under Rule 23(b)(3), is that the class must be currently and readily ascertainable based on objective criteria." *Marcus*,

16

687 F.3d at 592-93 (citations omitted).  "[A]t the certification stage, the plaintiff

need not identify the actual class members. She need only show how class

members can be identified." *Boyle v. Progressive Specialty Ins. Co.*, 326 F.R.D.

69, 83 (E.D. Pa. 2018) (citing *City Select Auto Sales Inc. v. BMW Bank of N. Am.,

Inc.*, 867 F.3d 434, 439 (3d Cir. 2017)).

      1.   *Ascertainability*

 "If class members are impossible to identify without extensive and

individualized fact-finding or 'mini-trials,' then a class action is inappropriate."

*Marcus*, 687 F.3d at 593.  "Some courts have held that where nothing in company

databases shows or could show whether individuals should be included in the

proposed class, the class definition fails." *Id.* (citations omitted).

     To date, Plaintiff has identified 184 Pennsylvania eviction records that

Defendant reported with inaccuracies identical to those it reported about her. ECF

No. 41-1 at 23.  And, as Plaintiff uncovered, "[t]here are thousands of other

inaccurate eviction records that Defendant had to correct after investigation." *Id*.

To identify these additional class members, Plaintiff asserts that "objective criteria

derived from Defendant's own records and publicly available court records can be

used to ascertain class membership." *Id*.  Plaintiff maintains that "these court

records as well as … Defendant's own screening reports and investigation records

the names and addresses of class members can be compiled for the purposes of

sending them notice, [which] [] plainly satisfies the 'ascertainably' requirement applied by the courts." *Id*.

Defendant claims its reporting is "highly individualized, raising issues with ascertainability, predominance, and commonality." ECF No. 51-1 at 16.   As such, Defendant argues that Plaintiff's class definition is incomplete because it "requires proof that, for every class member, RP On-Site failed to report certain types of dispositions that were 'reflected in court records publicly available at the time of Defendant's tenant screening report.'" *Id*. (citing ECF No. 41-1 at 10).   According to Defendant, "[t]he proposed class, as identified through the Pennsylvania Reports and the Dispute Records, is not ascertainable as to the single element of inaccuracy" because "Plaintiff has not even attempted to articulate a basis by which the Court could ascertain whether the disposition was publicly available at the time that RP On-Site issued its report." *Id*. at 16-17.

In reply, Plaintiff counters Defendant's position as follows:

> Misconstruing the elements of an FCRA willfulness claim, Defendant compounds its error by arguing that the class definition proposed by Plaintiff is improper allegedly because it 'does not track the elements' of a negligence claim. The causation and damages elements of a negligent violation of a section 1681e(b) claim, however, are not 'tracked' because they are simply not applicable here.

ECF No. 56. at 11 (internal citations omitted).   Accordingly, Plaintiff doubles down on its proposed definition and states that it is "firmly grounded upon [] objective criteria," as Plaintiff moves to certify a class for a willful violation of the

FCRA and uses her case as the prime example. *Id*. at 12.  Plaintiff has identified "objective criteria" that will enable the parties to identify class members, namely, that "[c]lass members can be identified precisely (by name and address) by reviewing Defendant's eviction reporting and dispute records and/or comparing the same with publicly available court records for eviction proceedings." *Id*.  Plaintiff furthers maintains that there is enough to ascertain the class through additional objective criteria *vis a vis* Defendant's interrogatory responses and corporate representative testimony about the dispute records, as well as the requested Pennsylvania records." *Id*. at 13.

Here, members are not impossible to identify.  In fact, there is nothing extensive about identification.  Defendant's concerns do not reflect an inability to determine class members by reference to an objective criteria.  All of the individualized fact-finding Defendant describes—which it claims will give rise to "mini-trials"—are merits determinations, not some administrative review to determine whether an objective element of a class definition is met.  At this stage, she need only show how class members can be identified.  The Court agrees with Plaintiff that the records are enough to ascertain a class and, moreover, to provide notice to an identifiable group of tenant applicants similarly situated to Plaintiff. Plaintiff correctly points out that Defendant contradicts itself insofar as it may rely upon its summary court records to sell reports and conduct its business, but

Plaintiff cannot rely upon those same records to ascertain a class. *Id*. at 13.

Therefore, in sum, Plaintiff has identified objective criteria, in the form of business

and court records, from which a class can be ascertained.  Accordingly, the

proposed class definition meets the requirements for ascertainability.

        2.    *Rule 23(a) Factors*

        a.    <u>*Numerosity*</u>

A plaintiff seeking certification must first demonstrate that the class is so

numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

"No minimum number of plaintiffs is required," but under Third Circuit precedent

"generally, if the named plaintiff demonstrates that the potential number of

plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Hayes v. Wal-*

*Mart Stores, Inc.*, 725 F.3d 349, 357, n.5 (3d Cir. 2013) (quoting *Stewart v.*

*Abraham*, 275 F.3d 220, 226-227 (3d Cir. 2001)).  Although Rule 23(a)(1) "does

not require a plaintiff to offer direct evidence of the exact number and identities of

the class members, in the absence of direct evidence, a plaintiff must show

sufficient circumstantial evidence specific to the products, problems, parties, and

geographic areas actually covered by the class definition to allow a district court to

make a factual finding." *Id*. (internal quotation and citation omitted).

Here, Defendant does not contest numerosity, as the requirement is easily

satisfied.  The proposed class is sufficiently numerous that joinder would be

impracticable, the class is subject to objective criteria that Plaintiff derived from Defendant's own records and publicly available court records.

        b.    *Commonality*

"[C]ommonality does not require perfect identity of questions of law or fact among all class members. Rather, 'even a single common question will do.'" *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 47 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 2020 WL 4331523 (3d Cir. July 28, 2020) (quoting *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015).  "The focus of the commonality inquiry is not on the strength of each plaintiff's claim, but instead is on whether the defendants' conduct was common as to all of the class members." *Id.* (internal alterations omitted) (quoting *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)).  The Third Circuit has held that a putative class satisfies the commonality requirement if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez*, 726 F.3d at 382 (internal quotation and citation omitted).

       Plaintiff asserts that the class is subject to three common questions:

       (a) whether Defendant's procedures in not obtaining actual court records (even though it chooses to sell eviction data in its reports) is reasonable under section 1681e(b) of the FCRA; (b) whether Defendant's reliance upon its public records vendor is reasonable in light of LexisNexis' poor track-record with other CRAs and

Defendant's lack of any audit; and (c) whether any violation of FCRA section 1681e(b) was negligent or willful.

ECF No. 41-1 at 24 (citing *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D 183, 201-02 (E.D. Va. 2015) (finding commonality satisfied on the following subjects: "the inaccuracy of the consumer reports, the reasonableness of the procedures alleged to cause these inaccuracies, whether Equifax's conduct was willful, and the determination of statutory damages.")).

Defendant argues that the common questions Plaintiff identified are "underinclusive and irrelevant" based on the following points:

> With the exception of LexisNexis's 'data collection practices,' none of these proposed questions has anything to do with RP On-Site's reporting processes, which lie at the core of any claim under § 1681e(b), and which would vary based on the many dimensions outlined above. And, with respect to the data practices of LexisNexis (one of four vendors), although Plaintiff concedes the relevance of those facts to the certification inquiry, she has no evidence of those practices, as she failed to engage in any discovery of LexisNexis during the years this case has been pending. LexisNexis's practices, as applied to the record of any class member, would also be individualized.

ECF No. 51-1 22.

In reply, Plaintiff maintains that "[t]he evidence here is that Defendant's procedure is *never* to obtain actual eviction court records and that it relies *exclusively and without any audit* upon its public records vendors (primarily LexisNexis, despite that vendor's poor track-record with other CRAs)." ECF No. 56 at 15 (emphasis in original).  Plaintiff goes on to emphasize that "[t]hese are not

22

just common issues; they are the key issues as to whether Defendant's procedures in reporting eviction data "assures" the "maximum possible accuracy" required under FCRA section 1681e(b), which Plaintiff believes is more than sufficient to satisfy commonality. *Id.* at 16.  Moreover, Plaintiff argues the fact that Defendant "concedes commonality as to at least 'one question of fact or law'" is sufficient. *Id.*

The Court agrees.  Because Plaintiff shares multiple questions of both fact and law with the prospective class—and the Third Circuit has stated that "the named plaintiffs [must only] share at least one question of fact or law with the grievances of the prospective class"—Plaintiff has satisfied the commonality requirement. *Rodriguez*, 726 F.3d at 382.  Defendant continues to conflate a negligence claim with a willfulness claim.  The focus is not on LexisNexis' conduct; the focus is on Defendant's conduct and its blanket reliance on LexisNexis to supply its reports that is common to all class members.

c.     *Typicality*

Rule 23(a)(3) provides that the typicality requirement is satisfied if the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  The typicality requirement is "designed to align the interests of the class and the class representative so that the latter will work to benefit the entire class through the pursuit of their own goals. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311

(3d Cir. 1998) (citing *Baby Neal*, 43 F.3d at 57).  Both typicality and commonality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotations and citation omitted).

To evaluate typicality, the Third Circuit instructs courts to ask whether the named plaintiff's claims are typical—in common sense terms—of the class' claims thus suggesting that the incentives of the named plaintiff are aligned with those of the class. *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-296 (3d Cir. 2006).  A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory. *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 428 (3d Cir. 2016).  Typicality is a "low threshold." *Id.*

Again, Defendant maintains that due to the individual nature of each claim Plaintiff cannot satisfy the typicality requirement.  Defendant contends that because class members face "unique defenses" renders Plaintiff a "representative not adequate to protect the interests of the class." ECF 51-1 at 13.  Defendant appears to blend the typicality and adequacy requirements – "Plaintiff also is an

atypical and inadequate class representative because she is subject to a complete causation and damages defense." ECF 51-1 at 25.

Plaintiff argues that her claim is entirely typical because "Defendant prepared a tenant screening report about her with an inaccurate eviction record on it, like it did for all proposed class members." ECF No. 41-1 at 25.  Plaintiff "intends to seek uniform statutory damages under FCRA section 1681n for herself and other class members." *Id*.  And, Defendant's failure to "assure" the "maximum possible of accuracy" in its eviction record reporting is exactly the claim of every class member. *Id*.  The Court agrees that these questions, which underlie Plaintiffs' claims, are shared by every putative class member.  Accordingly, the typicality element is established here.

Plaintiff correctly points out that "none of Defendant's arguments defeat typicality because Defendant again attempts to foist additional requirements onto a section 1681e(b) willfulness claim, and fundamentally mischaracterizes this claim throughout its opposition." ECF No. 56 at 17.  Again, Defendant is relying on the elements of a negligence claim to defeat an element of a willfulness claim.  As such, a "unique defense" will not become a major focus of this litigation.  The fact that records are derived from On-Site, LeasingDesk, or both does not distinguish Plaintiff from prospective class members whose data was derived from the other source because Defendant owns both.  The issue underlying both Plaintiff's and

every putative class member's claim, alike, is that Defendant used the same

vendor, LexisNexis, and accepted its reports at face value.  Plaintiff's claims,

therefore, arise from the same practice or course of conduct that gives rise to the

claims of other class members that are based on the same legal theory.  There are

no individualized claims or defenses, and all seek the same statutory damages.

Accordingly, the Court finds that the typicality requirement is satisfied.

> d.    *Adequacy*

The fourth prerequisite under Rule 23(a) is that the class representative and

class counsel must "fairly and adequately protect the interests of the class." Fed. R.

Civ. P. 23(a)(4).  The adequacy requirement "has two components: (1) concerning

the experience and performance of class counsel; and (2) concerning the interests

and incentives of the representative plaintiffs." *Dewey v. Volkswagen*

*Aktiengesellschaft*, 681 F.3d 170, 181-182 (3d Cir. 2012) (internal quotations and

citation omitted).  The Third Circuit has made clear that "adequate representation

of a particular claim is determined by the alignment of interests of class members,

not proof of vigorous pursuit of the claim." *In re Cmty. Bank of N. Virginia*, 418

F.3d 277, 307 (3d Cir. 2005) (internal quotations and citation omitted).  "In

analyzing this criteria, the court must determine whether the representatives'

interests conflict with those of the class and whether the class attorney is capable

of representing the class." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 185

(3d Cir. 2001) (citations omitted).  The Third Circuit instructs courts to consider whether the "attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class." *Baby Neal*, 43 F.3d at 55.

Here, there is no indication that Plaintiff possesses any interests adverse to the class.  The Court finds that Plaintiff's counsel is qualified and experienced in class action, complex litigation, and consumer litigation.  Plaintiff's counsel has been certified to represent classes under the FCRA, as well as other consumer protection laws, by this Court and by courts in other districts, and has tried class actions to verdict. *See* ECF No. 41-14.  Accordingly, Plaintiff and her counsel are adequate class representatives.

### 3. *Rule 23(b)(3) Requirements*

#### a. *Predominance*

Under Rule 23(b)(3), class certification is appropriate if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  "The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson*

*Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 W.

Rubenstein, Newberg on Class Actions § 4:49, at 195–96 (5th ed. 2012)).

More specifically, "[t]o determine whether the putative class has satisfied

predominance (indeed, all applicable Rule 23 requirements), the District Court

must conduct a 'rigorous analysis' of the evidence and arguments presented."

*Lamictal*, 957 F.3d at 190–91 (citing *Hydrogen Peroxide*, 552 F.3d at 309 (quoting

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  The Third Circuit

recently broke down this analysis into three parts.  "First, the court must 'find[]'

that the requirements of  Rule 23 are met and any '[f]actual determinations

supporting  Rule 23 findings must be made by a preponderance of the evidence.'"

*Id*. (citing *Hydrogen Peroxide*, 552 F.3d at 307).  "Second, 'the court must resolve

all factual or legal disputes relevant to class certification, even if they overlap with

the merits.'" *Id*.; *see Dukes*, 564 U.S. at 351 ("That [overlap] cannot be helped.");

*see also Marcus*, 687 F.3d at 591 ("Rule 23 gives no license to shy away from

making factual findings that are necessary to determine whether the Rule's

requirements have been met.").  "Third, the court must consider 'all relevant

evidence and arguments,' including 'expert testimony, whether offered by a party

seeking class certification or by a party opposing it.'" *Id.* (citing *Hydrogen

Peroxide*, 552 F.3d at 307).  Once completed and the Court finds by a

preponderance of the evidence that the claims are capable of common proof at trial, then the predominance requirement is satisfied. *Lamictal*, 957 F.3d at 191.

Plaintiff highlights courts that have found common issues predominating in FCRA class actions seeking only statutory damages, such as the instant case. *See* ECF No. 41-1 at 27 (citing, *inter alia*, *Miller v. Trans Union, LLC*, 2017 WL 412641, at *8-11 (M.D. Pa. Jan. 18, 2017) (report and recommendation certifying FCRA statutory damages case for class treatment); *Chakejian v. Equifax Info. Servs., LLC*, 256 F.R.D. 492, 498, 500-01 (E.D. Pa. 2009) (certifying FCRA statutory damages class action); *Summerfield v. Equifax Info, Servs. LLC*, 264 F.R.D. 133, 139, 142 (D.N.J. Sept. 30, 2009).  Moreover, Plaintiff suggests "predominance is established where common facts about the willfulness of a defendant's conduct provide for a statutory damage remedy." *Id*. (citing *Taha v. Cnty. of Bucks*, 862 F.3d 292, 309 (3d Cir. 2017)).

Defendant raises various arguments at different points throughout its opposition brief directed at predominance. *See* ECF No. 51-1 at 16, 18, 21, 25, 28, 29.  But Defendant advances no discernible arguments distinguishing commonality and predominance.  First, under the heading "Individualized Issues About RP On-Site's Report Predominate," Defendant argues: (1) "that an individualized review of each screening report and the underlying court documents would be necessary to assess the reasonableness of RP On-Site's reporting"; (2) "[t]he circumstances and

the timing of the last update by the vendor would need to be electronically traced

for each record, which would be a highly-individualized task across tens of

thousands of records, with varying proof then presented at trial as to whether the

collection frequency for an individual court was reasonable"; and (3) "the

substantive content of each court file, which would inform an assessment of the

reasonableness of RP On-Site's procedures, will vary by record." *See* ECF No. 51-

1 at 18-20.  Each argument relates to the accuracy, timing, and process that

Defendant uses to acquire, maintain, and update the data it reports.  Furthermore,

Defendant argues that because it "has a due process right to contest any claim of a

'willful' violation based on the facts and circumstance of each record challenged

by any putative class member," the purported individualized data collection

practice discussed above "will be even more individualized." *Id*. at 21-22.

All of Defendant's arguments ignore Plaintiff's theory of the case—i.e., that

Defendant's reports are consistently inaccurate because Defendant obtains

summary eviction data from its vendors and does not prioritize adjudication

updates.  Based on this theory, the Court agrees that "[t]he success or failure of the

Plaintiff's claim and that of the class will depend upon the same core evidence and

legal issues," including but not limited to the following:

> (1)    the acquisition of summary eviction records by Defendant
> (rather than actual court records);

> (2)    its failure to audit or even properly oversee its public record

vendors;

(3)     Defendant's motive to generate profit by selling reports;

(4)     LexisNexis' "commercially reasonable" data collection
        practices and how those practices reflect upon the reporting of
        eviction records for the class members here;

(5)     whether Defendant had sufficient knowledge of its error rate
        and the undependability of its public records vendors;

(6)     whether Defendant's failure to assure accuracy for Plaintiff and
        the class was willful, or merely negligent.

ECF No. 56 at 22 n.9.  These common issues predominate over any individualized

issues related to Defendant's data collection practices.  Here, the jury should be

able to determine whether Defendant's a violation was "willful," or merely

negligent, by considering common evidence related to Defendant's policy, practice

and procedure without focusing on information individual to a class member.

Defendant's arguments nearly mirror those made in a highly analogous

FCRA class action.  In *Feliciano v. CoreLogic Rental Property Solutions, LLC*,

332 F.R.D. 98 (S.D.N.Y. 2019), the plaintiff alleged that the defendant violated the

FCRA by "fail[ing] to insure the accuracy of … tenant data before selling the data

and the resulting reports to prospective landlords, who rely on them to assess and

screen potential tenants." *Id.* at 102.  Like Plaintiff here, the plaintiff in *Feliciano*

alleged "that, because of delays and deficient practices in collecting and updating

[court] records reported to landlords, defendant ha[d] inaccurately reported that

housing suits against tenants were ongoing, when in fact the suits had been

favorably resolved in favor of the tenant." *Id.*  In further similarity to the present case, the plaintiff sought statutory damages.  As Defendant argues here, the defendant in *Feliciano* argued that predominance was lacking because "individual issues … [related to] the accuracy of the individual reports and the willfulness of [Defendant] … predominate." *Id.* at 107-08 ("[W]hether a report is accurate may involve an individualized inquiry.").  More specifically, the defendant "[took] the position that the accuracy, timing, and technique used to **acquire** … **data** of each class member would require individualized class determinations" and "that its methods have varied over time, creating an individualized question of reasonableness in each case." *Id.* at 108 (emphasis added).

The *Feliciano* court rejected the defendant's arguments outright, explaining that because "[t]he allegations as to [defendant]'s **collection, updating, and reporting of case information** are common to all members of the class," common questions predominated the purported individualized inquiries related to the defendant's collection of data. *Id.* at 107 (emphasis added).  Here, Defendant's arguments directed at its data collection practices will similarly be established using common evidence.  Plaintiff proposes that Defendant's behavior is systemic. In other words, it takes the form of a policy, practice, or procedure that, effectively, produces the same result – the generation of inaccurate reports.  Whether Defendant's blind acceptance of summary reports from its vendor, LexisNexis,

rises to level willful, or reckless, disregard for its duty under the FCRA is the common issue. Plaintiff's sole claim, willfulness violation, does not give rise to individual determinations that triggers causation and defenses, like a negligence claim. Here, the factual context that Plaintiff asserts and her overall contention – that Defendant's behavior produced a common, generally applicable impact – poses common questions capable of classwide resolution.

The Court understands Defendant's desire to challenge causality on a case-by-case basis. Hypothetical individualized errors from one report to the next, however, have no bearing on the key liability inquiry in this case. Plaintiff alleges that Defendant should not have taken LexisNexis data at face value and use it in its own reports, without first performing its own independent assessment of that data. Thus, liability does not turn on the reasonableness of the error(s) in the individual tenant applicant's reports, but rather on the reasonableness of Defendant's collection practice, policy, and procedure that produced the error rate giving rise to the class' claim. Plaintiff asserts that Defendant's procedures in this regard are uniform and do not vary from one individual report to the next.

Similarly, whether Defendant's acceptance of LexisNexis reports at face value constitutes willful conduct will also turn on common evidence related to Defendant's relationship with LexisNexis, process for accepting data therefrom, whether Defendant was aware of the likelihood that its data may contain

inaccuracies, Defendant's knowledge of its error rate, and other common evidence related to the willfulness of Defendant's conduct.  As such, this case centers on Defendant's common acts, as well as its state of mind insofar as it was aware of the alleged unjustifiably high risk of harm that was either known or so obvious that it should have been known.  The Court is not currently charged with determining whether Plaintiff will ultimately succeed at trial under her theory.  That question is for the trier of fact.  Here, the question is whether the questions common to the class are capable of common proof at trial, and the Court is convinced by a preponderance of the evidence that it is.

   b. *Superiority*

  A court must find that the use of a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  To determine whether plaintiffs have met their burden on superiority, courts consider "class members' interests in pursuing separate actions, the extent of any independent litigation already begun by class members, the desirability of concentrating the litigation in this forum, and the difficulties likely to be encountered in the management of a class action." *Suboxone*, 421 F. Supp. 3d at 65, *aff'd sub nom*. *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 2020 WL 4331523 (3d Cir. July 28, 2020) (citing *In re Mushroom*

*Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 208 (E.D. Pa. 2016) (quotations omitted)).

Here, a class action represents a superior method for resolving this controversy. This class action mechanism allows the class to prosecute claims even for relatively modest statutory damages. Moreover, the vast majority of individuals affected by Defendant's practices are unlikely to know that their rights have been violated. The alternative, therefore, would be no action at all. As such, in light of that comparison, the class-action mechanism constitutes a superior means of adjudicating the claim before the Court.

Defendant argues that predominance is lacking because the Court will need to conduct "a manual review of each report, as well as testimony from each landlord," to assess whether the report "had [any] effect on a consumer's rental prospects." ECF No. 51-1 at 25-26. As such, Defendant asserts that "[t]he class action mechanism is not superior to individual actions because the structure of the FCRA ensures that consumers have sufficient incentives to pursue individual litigation when they have suffered actual injury." *Id.* at 28. In other words, Defendant argues that causation cannot be established without resolving individualized issues. Defendant also argues that "individualized inquiries … predominate as to the amount of damages" because the statute at issue prescribes a

range of awardable damages, between $100 to $1,000. *Id*. at 27.  Both of these

arguments are inapposite.

Again, Defendant "conflates an FCRA … willfulness claim with a …

negligence claim." ECF No. 56 at 26.  Plaintiff has not brought a claim for a

negligent violation of the FCRA.  Therefore, Plaintiff need not prove causation.  In

a similar vein, Defendant's argument that individualized damages inquiries defeat

predominance is equally misguided because it is well-settled that individualized

damages inquiries do not defeat predominance. *See, e.g.*, *Suboxone*, 421 F. Supp.

3d at 65, *aff'd sub nom*. *In re Suboxone (Buprenorphine Hydrochlorine &*

*Naloxone) Antitrust Litig.*, 2020 WL 4331523 (3d Cir. July 28, 2020) (rejecting the

defendant's argument that "the eventual need for individualized damages inquiries

defeats predominance.").  This is especially true where, as here, movants for class

certification allege only statutory damages. *See, e.g.*, *Soutter*, 307 F.R.D. at 217

("Unlike individualized, subjective determinations of damages, which could spawn

a series of mini-trials, this is simply a matter of counting heads and data points.").

Compared to any available alternatives, the facts of the instant case demonstrate

that the class-action mechanism constitutes a superior method for fairly and

efficiently adjudicating the controversy.

6. *Personal Jurisdiction*

Defendant argues that the Court lacks personal jurisdiction over certain out-of-state class members, relying solely upon the Supreme Court's opinion *Bristol-Myers Squibb v. Superior Court of California, San Francisco County*, 137 S. Ct. 1773, 1777-78 (2017). *See* ECF No. 51-1 at 30-31.  A court in this district recently distinguished *Bristol-Myers* as follows:

> *Bristol-Myers* did not involve a proposed class action suit as here. Rather, in *Bristol-Myers*, more than 600 named plaintiffs, residents and nonresidents of California, instituted a mass tort action in California against Bristol-Myers Squibb Company related to a prescription drug, Plavix. 137 S.Ct. at 1778. The *Bristol-Myers* Court held that California lacked specific jurisdiction over the nonresident plaintiffs' claims. *Id*. at 1781-83. The Court reasoned that because the nonresidents were not prescribed, did not purchase, did not ingest, and were not injured by the drug in California, there was no 'connection between the forum and the specific claims at issue.' *Id*. at 1781. The Court explained that '[t]he mere fact other plaintiffs were prescribed, obtained, and ingested Plavix in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims.' *Id*. at 1781.

*Velazquez v. State Farm Fire & Cas. Co*., 2020 WL 1942784, at *10 (E.D. Pa. Mar. 27, 2020), *report and recommendation adopted*, 2020 WL 1939802 (E.D. Pa. Apr. 22, 2020).  Based on these distinctions, this Court refused to extend *Bristol-Myers*' holding to class actions. *See id.* at *11 ("In the absence of binding precedent on the applicability of *Bristol-Myers* to class actions, I respectfully recommend against extending its holding at this time."); *see also Gress v. Freedom Mortg. Corp*., 386 F. Supp. 3d 455, 465 (M.D. Pa. 2019) (declining to apply

*Bristol-Myers* to class action claim because "[i]t is plain to see that *Bristol-Myers Squibb* is not squarely on point, and we see no basis to extend the application of what otherwise appears to be a limited holding.").  Therefore, the Court finds Defendant's personal jurisdiction argument inapplicable.

7.    *Trial Plan*

Plaintiff proposes a detailed trial plan in her motion for class certification, *see* ECF No. 41-1 at 30-31, which the Court finds acceptable.  In keeping with Plaintiff's proposed plan, the Court agrees and anticipates that trial in this case will be relatively straight forward. *See e.g.*, *Ramirez v. Trans Union, LLC*, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017) (upholding verdict rendered after weeklong trial in FCRA class action) *aff'd, Ramirez v. TransUnion, LLC*, 2020 WL 946973 (9th Cir. Feb. 27, 2020) (class certification finding and liability and statutory damages verdict upheld, and also punitive damages were upheld but reduced to 4:1 ratio).

## IV.    CONCLUSION

The Court finds that Plaintiff has proven by a preponderance of the evidence that class certification is warranted and proper.  Plaintiff established all of the Rule 23(a) prerequisites and both parts of the Rule 23(b)(3) test.  In addition, the class is readily ascertainable based on objective criteria.  Accordingly, Plaintiff's Motion for Class Certification (ECF No. 41) is granted in the accompanying order.

**DATE:** August 25, 2020                    **BY THE COURT:**

/s/ Chad F. Kenney

_____

**CHAD F. KENNEY, JUDGE**